[Cite as *State v. Webster*, 2021-Ohio-3218.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

State of Ohio,                                    :

    Plaintiff-Appellee,                    :                No. 20AP-171
                                    (C.P.C. No. 17CR-4852)

v.                                               :

                                   (REGULAR CALENDAR)

Desmond L. Webster,                              :

    Defendant-Appellant.                   :

---

D E C I S I O N

Rendered on September 16, 2021

---

**On brief:** [*G. Gary Tyack*], Prosecuting Attorney, and *Kimberly M. Bond*, for appellee. **Argued:** *Kimberly M. Bond.*

**On brief:** *Carpenter Lipps & Leland LLP, Kort Gatterdam,* and *Erik P. Henry*, for appellant. **Argued:** *Kort Gatterdam.*

---

APPEAL from the Franklin County Court of Common Pleas

LUPER SCHUSTER, J.

{¶ 1} Defendant-appellant, Desmond L. Webster, appeals from a judgment entry of the Franklin County Court of Common Pleas finding him guilty 0f aggravated burglary, kidnapping, aggravated murder, murder, felonious assault, and having weapons while under disability and sentencing him to life in prison without the possibility of parole. For the following reasons, we affirm.

## I. Facts and Procedural History

{¶ 2} By indictment filed September 1, 2017, plaintiff-appellee, State of Ohio, charged Webster with one count of aggravated burglary in violation of R.C. 2911.11, a first-degree felony; four counts of kidnapping in violation of R.C. 2905.01, all first-degree felonies; four counts of aggravated robbery in violation of R.C. 2911.01, all first-degree

felonies; four counts of aggravated murder in violation of R.C. 2903.01, all unclassified felonies; four counts of murder in violation of R.C. 2903.02, all unclassified felonies; two counts of attempted murder in violation of R.C. 2923.02 and 2903.02, both first-degree felonies; three counts of felonious assault in violation of R.C. 2903.11, all second-degree felonies; and one count of having weapons while under disability in violation of R.C. 2923.13, a third-degree felony. All of the charges with the exception of the having weapons while under disability charge contained accompanying three-year firearm specifications pursuant to R.C. 2941.145(A). The charges related to the deaths of Mohamed A. Mohamed and Abdul Cadir A. Yussuf on or about July 18 to July 19, 2017. Additionally, the indictment included three other codefendants. Webster entered a plea of not guilty.

{¶ 3} Webster waived his right to a jury trial on the having weapons while under disability charge, and a trial on the remaining counts against Webster and one of his codefendants, Milton W. Moore II, began on January 6, 2020. At trial, Julius Anderson, who is known by the nickname "Juice," testified that he had known Webster for most of his life and viewed Webster as his stepfather. Anderson agreed to provide testimony in Webster's case in exchange for a plea agreement with the state. Pursuant to his testimony, Anderson was living in the Wedgewood apartment complex in July 2017 and selling drugs for Webster. Sometime prior to July 18, 2017, Anderson said he bought $15,000 worth of heroin and crack cocaine from Webster and gave the drugs to a friend, Aden Hassan, for safekeeping. Anderson testified he later learned that Hassan's younger brothers, who Anderson estimated to be 10 or 11 years old, took the drugs and sold them for $40 to Mulhidin Haji, who is known by the nickname "Dope Boy." Anderson said that when he told Webster what had happened, Webster was "mad" about the theft. (Tr. Vol. 4 at 733.)

{¶ 4} Anderson testified that on the afternoon of July 18, 2017, he went with Hassan and Hassan's little brothers to Haji's apartment, identified as apartment 4, in the Wedgewood apartment complex. Anderson said he was carrying a gun. When Anderson entered the apartment, he encountered four men inside: Haji; Omar Omar, known as "Cribface"; Yussuf, known as "Shotta"; and a fourth man Anderson did not know. The fourth man was Mohamed. Anderson testified that Hassan spoke to the men in Somali to ask where the drugs were, but the men denied having the drugs.

{¶ 5} After the men said they did not have the drugs, Omar testified that Anderson called Webster, who is also known as "Cutty," and said that Webster arrived at the apartment about a half an hour after Anderson and started giving orders. Omar and Anderson both testified that Webster repeatedly demanded to know the location of the drugs and hit Haji with his hand and with his gun.

{¶ 6} Anderson testified that while Webster was in the apartment, he called Joshua Radabaugh, also known as "Scarface," due to the prominent scar on his face, and told Radabaugh to bring duct tape and gasoline to the apartment. Radabaugh was addicted to heroin and purchased his drugs from Webster, testifying that he viewed Webster as a father figure because Webster took care of him.

{¶ 7} Radabaugh testified he followed Webster's instructions, bought duct tape and a small red gas can, and brought the items to the Wedgewood apartment. Omar also testified that Radabaugh showed up at the apartment with the duct tape and a gas can. Anderson said Radabaugh arrived sometime between 4:00 and 4:15 p.m. Anderson, Radabaugh, and Omar all testified that Webster directed Radabaugh to duct tape the four men's hands together. Radabaugh said he hit one of the men when he resisted, and he also said he had to re-tape them several times to make sure the tape was secure. At one point, Radabaugh said he had to leave the apartment to buy more tape, but he testified he returned to tape the victims again.

{¶ 8} Radabaugh testified that the four men eventually agreed to return the drugs. At that point, Radabaugh said Webster gave Radabaugh his gun and instructed Radabaugh to leave the apartment with Hassan and Yussuf to retrieve the drugs. Radabaugh testified they took Hassan's car and that they recovered the heroin as well as some marijuana. Anderson estimated that Radabaugh was gone for approximately 30 or 45 minutes. When they returned to the Wedgewood apartment, Radabaugh said he gave the drugs to Anderson and gave the gun back to Webster.

{¶ 9} According to Radabaugh's, Anderson's, and Omar's testimony, once the men were back in the apartment, Webster decided that the four men were going to be killed. At that point, Radabaugh, Anderson, and Omar said that Webster called Moore, the codefendant in the trial, and told Moore to kill them all. Additionally, Radabaugh and Anderson testified that Webster told Radabaugh to burn the building down. Both

Radabaugh and Omar testified that Webster said burning the building would destroy all the evidence. Anderson said that Webster gave Moore one of his guns. Anderson and Omar testified that the four men were ordered to undress, and Moore hit one of the men who initially refused.

{¶ 10} At some point that evening, Anderson said he informed his marijuana dealer about the unfolding situation and that his dealer sent a man named Dodda to the apartment. After Anderson let Dodda in the apartment, Anderson said Moore ordered Dodda to take off his clothes like the four men. Anderson and Omar both testified that Moore told Dodda that the only way he could leave the apartment was if he shot one of the four men. According to Anderson's testimony, Dodda agreed and was allowed to get dressed.

{¶ 11} Anderson and Radabaugh testified that they, along with Hassan and Webster, left the apartment before the shooting started. Radabaugh testified he left the group to move his sister's car away from the scene. While Anderson was standing outside the apartment with Webster and Hassan, Anderson said he heard four gunshots. Anderson testified that Webster was mad when he learned Omar and Haji were still alive since he had directed Moore to kill all four men.

{¶ 12} Omar testified that Dodda seemed afraid and did not want to shoot anyone but that Moore told Dodda he had no choice. Omar said that Dodda shot Yussuf and Moore shot Mohamed. Pursuant to Omar's testimony, both Moore and Dodda continued to fire their weapons down at the victims on the floor as they left the apartment. Omar estimated Moore and Dodda fired between four and six shots.

{¶ 13} Once Dodda and Moore left the apartment, Omar said he and Haji, who both survived the gunfire, removed their duct tape. Hoping to find someone to call an ambulance, Omar said he jumped through a window to the ground below. He then returned to the apartment.

{¶ 14} Radabaugh said he was walking back toward the Wedgewood apartment complex to "take care of the evidence," but as he approached, he saw police officers running around and looking for someone. (Tr. Vol. 3 at 543.) Radabaugh denied hearing any gunshots and was not sure at what point the shooting occurred, but he estimated he had been gone from the apartment complex for 10 or 15 minutes. Instead of returning to the

apartment, Radabaugh said he got into a Prius parked nearby and drove away. Radabaugh testified that Webster had given him the keys to the vehicle while they were both inside the apartment.

{¶ 15} Radabaugh said he drove the Prius to a parking lot where he then used heroin. When he saw a police officer approaching the car, Radabaugh fled in the vehicle. After driving the vehicle to an alley, Radabaugh testified he set the car on fire.

{¶ 16} At some point after the shooting, Radabaugh said that Webster called him and asked if he was interested in leaving town. Radabaugh testified that Webster said police were looking for both of them. Radabaugh agreed to leave town with Webster and Webster's girlfriend. Eventually, law enforcement in Oklahoma stopped the three individuals for a traffic violation. Law enforcement found Webster hiding in the vehicle's trunk during the traffic stop.

{¶ 17} After his arrest, Radabaugh initially told investigators that Anderson was the one in charge while inside the apartment. However, Radabaugh eventually changed his story to police and implicated Webster, testifying that he lied initially in an attempt to protect Webster. Similar to Anderson, Radabaugh had agreed to provide testimony in exchange for a plea agreement with the state. Anderson also admitted to initially lying to investigators and denying any involvement before ultimately agreeing to testify for the state. Additionally, Omar admitted to initially lying to police and telling them the fight was about a woman because he did not want to admit the fight was about drugs. Omar denied being involved in any drug trafficking.

{¶ 18} Officer Nicholas Talone of the Columbus Division of Police testified that he was already at the Wedgewood apartment complex in the early morning hours of July 19, 2017 when he heard three to four gunshots. Officer Derek Corbin was also already at the Wedgewood apartments with Officer Talone and testified that he heard gunshots and saw someone running toward building 832. The officers ran toward building 832 and cleared the building. As they approached a group of men standing on a porch nearby, Officer Corbin said one of the men took off running. The officers pursued the man but could not locate him.

{¶ 19} While the officers were running, a man flagged them down and told them his daughter had been shot. Officer Talone said he followed the man into a basement

apartment where he encountered a female, identified as Ashley Tucker, with a gunshot wound to her back.  Additionally, Officer Talone observed two bullet holes in the apartment's ceiling.  The unit directly above Tucker's apartment was apartment 4.

{¶ 20} Sergeant Ronnie Lucas testified that upon learning the gunshots originated in apartment 4, he entered that apartment and found four men.  Two of the men were prone on the ground; Mohamed moved but could not communicate, while Yussuf was pronounced dead at the scene.  Sergeant Lucas said the other two men were standing.  One of the men was screaming and Sergeant Lucas described the other man as being in shock.  All four men were naked and covered in blood.  Sergeant Lucas further testified that all four men had duct tape on their necks and wrists.

{¶ 21} The deputy coroner, Dr. Bruce Wainer, M.D., testified that Yussuf died from a gunshot wound that penetrated his skull.  As to Mohamed's cause of death, the coroner stated that Mohamed had been shot in the head, but the bullet did not penetrate his brain.  The impact of the bullet, however, caused significant trauma that ultimately caused Mohamed's death.

{¶ 22} A firearm expert, Erica Pattie, examined shell casings recovered from the scene and concluded that three of the casings came from the same .40 caliber firearm.  One other casing was determined to have come from a .380 automatic weapon, but no comparison was possible.  The expert also examined bullet fragments from the scene and from the homicide victims.  She ultimately concluded that there were spent bullets from three different firearms and casings from two different firearms.

{¶ 23} Following deliberations, the jury found Webster guilty of one count of aggravated burglary, four counts of kidnapping, four counts of aggravated murder, four counts of murder, and three counts of felonious assault, along with accompanying firearm specifications for each of these counts.  However, the jury found Webster not guilty of four counts of aggravated robbery.  The trial court then found Webster guilty of the having weapons under disability charge.

{¶ 24} The trial court held a sentencing hearing on February 20, 2020 and sentenced Webster to life in prison without the possibility of parole.  The trial court also entered a nolle prosequi on two counts of attempted murder and journalized Webster's convictions and sentence in a February 27, 2020 judgment entry.  Webster timely appeals.

## II. Assignments of Error

{¶ 25} Webster assigns the following errors for our review:

[1.] The trial court improperly instructed the jury on aiding and abetting in violation of appellant's due process rights guaranteed by the United States and Ohio Constitutions.

[2.] Appellant was deprived of the effective assistance of trial counsel in violation of appellant's rights under the Sixth and Fourteenth Amendments to the United States Constitution, and Section 10 and 16, Article I of the Ohio Constitution.

[3.] The trial court violated appellant's rights to due process and a fair trial when it entered a judgment of conviction based on insufficient evidence and against the manifest weight of the evidence in violation of appellant's rights under the United States and Ohio Constitutions.

## III. First Assignment of Error – Jury Instruction

{¶ 26} In his first assignment of error, Webster argues the trial court erred in instructing the jury on aiding and abetting. More specifically, Webster asserts the trial court erred in providing an incomplete instruction as the instruction omitted the requisite intent.

{¶ 27} Webster did not object to the jury instructions at trial and, thus, has waived all but plain error. *State v. Lipkins*, 10th Dist. No. 16AP-616, 2017-Ohio-4085, ¶ 28, citing *State v. Cook*, 65 Ohio St.3d 516, 527 (1992). An appellate court recognizes plain error with utmost caution, under exceptional circumstances, and only to prevent a miscarriage of justice. *State v. Pilgrim*, 184 Ohio App.3d 675, 2009-Ohio-5357, ¶ 58 (10th Dist.), citing *State v. Diar*, 120 Ohio St.3d 460, 2008-Ohio-6266, ¶ 139.

{¶ 28} For an error to be a "plain error" under Crim.R. 52(B), it must satisfy three prongs: (1) there must be an error, meaning a deviation from a legal rule, (2) the error must be "plain," meaning an "obvious" defect in the trial proceedings, and (3) the error must have affected "substantial rights," meaning the error must have affected the outcome of the trial. *State v. Barnes*, 94 Ohio St.3d 21, 27 (2002). A court will reverse on plain error based on an erroneous jury instruction only upon a showing that the outcome " 'clearly would have been different absent the error.' " *State v. Petty*, 10th Dist. No. 11AP-716, 2012-Ohio-2989, ¶ 15, quoting *State v. Zachery*, 10th Dist. No. 08AP-451, 2009-Ohio-1180, ¶ 8.

{¶ 29} R.C. 2923.03, the complicity statute, provides "[n]o person, acting with the kind of culpability required for the commission of the offense, shall * * * [a]id or abet another in committing the offense." R.C. 2923.03(A)(2). In instructing the jury, the trial court stated:

> Either defendant may be convicted of aggravated burglary in Count 1 as an aider or abettor. An "aider or abettor" is one who aids, assists, or encourages another to commit a crime, and participates in the commission of the offense by some act, word, or gesture.
>
> "Aid" means to help, assist, or strengthen.
>
> "Abet" means to encourage, counsel, incite, or assist.
>
> The mere presence of either defendant at the scene of the crime and guilty knowledge of the crime are not enough to convict him of aiding or abetting. This instruction applies to all counts of the indictment.

(Tr. Vol. 6 at 1212-13.) However, Webster notes that the Ohio Jury Instructions on complicity and aiding and abetting provide, in part, that "[b]efore you can find the defendant guilty of complicity by aiding and abetting, you must find beyond a reasonable doubt that the defendant supported, assisted, encouraged, cooperated with, advised, or incited the principal offender in the commission of the offense *and that the defendant shared the criminal intent of the principal offender*." (Emphasis added.) Ohio Jury Instructions, CR Section 523.03(B) (Rev. Feb. 6, 2016). Thus, Webster argues the trial court's instruction was incomplete because it did not include an instruction that Webster must share the criminal intent of the principal offender. *See State v. Johnson*, 93 Ohio St.3d 240, 245-46 (2001) ("to support a conviction for complicity by aiding and abetting pursuant to R.C. 2923.03(A)(2), the evidence must show that the defendant supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of crime, and that the defendant *shared the criminal intent of the principal*") (emphasis added).

{¶ 30} "As a general rule, a defendant is entitled to have the jury instructed on all elements that must be proved to establish the crime with which he is charged." *State v. Adams*, 62 Ohio St.2d 151, 153 (1980). However, "a trial court's failure to separately and

specifically charge the jury on every element of each crime with which a defendant is charged does not per se constitute plain error nor does it necessarily require reversal of a conviction."  *Id.* at 154.  Instead, "[o]nly by reviewing the record in each case can the probable impact of such a failure be determined, and a decision reached as to whether substantial prejudice may have been visited on the defendant, thereby resulting in a manifest miscarriage of justice."  *Id.*

{¶ 31}  As the state notes, the Ohio Jury Instructions are not binding legal authority. *See, e.g., State v. Ellis*, 10th Dist. No. 11AP-939, 2012-Ohio-3586, ¶ 12 (noting that although the Ohio Jury Instructions are not binding, they are, nonetheless, a helpful example of generally accepted interpretation of Ohio statutes); *State v. Teitelbaum*, 10th Dist. No. 14AP-310, 2016-Ohio-3524, ¶ 138 (noting "an instruction's inclusion in the Ohio Jury Instructions is not dispositive of its accuracy").  Though the state agrees the complicity instruction could have been more complete, it asserts the instructions as a whole were nonetheless sufficient to instruct the jury on the theory of aiding and abetting.  Specifically, while the complicity instruction, itself, did not include a statement that the defendant shared the criminal intent of the principal offender, the trial court did provide complete definitions of the requisite mens rea for each of the charged offenses. Additionally, the trial court instructed the jury that it must consider each portion of the instructions "in light of and in harmony with all of the instructions."  (Tr. Vol. 6 at 1200.)  Thus, the state posits that the jury charge as a whole sufficiently conveyed to the jury that it must find each of the defendants had the criminal intent required for each offense.  *See State v. Graggs*, 10th Dist. No. 09AP-339, 2009-Ohio-5975, ¶ 32 (declining to find plain error in an accomplice liability instruction that did not include a statement that the appellant had to have the same mental state as the principal offender but did instruct on the requisite mental state for each of the charged offenses, finding "the jury instructions, when considered as a whole, probably did not mislead the jury concerning the requisite criminal intent required for a finding of complicity"); *but see State v. Noor*, 1oth Dist. No. 13AP-165, 2014-Ohio-3397, ¶ 46 (finding "[i]t is not enough that the jury could have speculated from the given instructions that, in order to be convicted of aiding or abetting, appellant must have had the mental culpability of the principal offense—it should have been so instructed").

{¶ 32} Webster, in turn, relies on the decision of the United States Court of Appeals for the Sixth Circuit in *Langford v. Warden, Ross. Corr. Inst.*, 593 Fed.Appx. 422 (6th Cir.2014). In *Langford*, the trial court did not instruct the jury "that conviction as an accomplice, under Ohio law, requires that the defendant have the same intent as the principal [offender]." *Langford* at 428. Despite the state's argument that the jury instructions, as a whole, conveyed the proper mens rea for each offense, the Sixth Circuit, applying federal harmless error review, concluded "[t]he failure to instruct on the mens rea of complicity, therefore, had a substantial influence in determining the jury's verdict." *Id.* at 432. The state notes both that *Langford* applied a different standard than the plain error standard applicable here and that the United States Supreme Court subsequently vacated the Sixth Circuit's *Langford* decision. *See Hooks v. Langford*, 576 U.S. 1049 (2015) (vacating *Langford*).

{¶ 33} Here, we need not determine whether the trial court's instruction on aiding and abetting was a plain error under the first and second prongs of the plain error test because, even if it was, Webster is unable to satisfy the third prong of the plain error test. Based on this record, Webster cannot demonstrate that the outcome of the trial would have been different had the trial court provided a different instruction on aiding and abetting and thus cannot show the requisite prejudice to require reversal.

{¶ 34} Webster argues that because the state's theory on his participation in the aggravated murder and murder charges rests on a complicity theory, the trial court's deficient jury instruction must be considered prejudicial. He further argues that there was no evidence that he shared Moore's purpose to kill. However, Webster's argument ignores the testimony from Radabaugh, Anderson, and Omar that Webster was in charge and ordered Moore to shoot and kill the victims. As we noted above, the trial court properly instructed the jury on the applicable mens rea for every individual offense and further instructed the jury that it must consider each portion of the instructions "in light of and in harmony with all of the instructions." (Tr. Vol. 6 at 1200.) Moreover, the trial court instructed the jury that the mere presence of either defendant at the scene of the crime and guilty knowledge of the crime are not enough to convict him of aiding or abetting. Considering the entire record, we do not agree with Webster that the jury would have reached a different outcome had the trial court instructed the jury that Webster must have

shared the criminal intent of Moore. *See Graggs* at ¶ 31 (finding no plain error in complicity instruction where trial court instructed the jury on the requisite mental state for each charged offense and instructed the jury that appellant's mere presence at the scene of the crime and guilty knowledge of the crimes are not enough to convict him of aiding and abetting); *State v. Gibbs*, 8th Dist. No. 86126, 2006-Ohio-175, ¶ 24 (where the trial court instructed the jury on the culpable mental states necessary to convict the defendant of the principal offenses, "a defendant is not prejudiced when a complicity instruction does not refer specifically to the culpable mental state if the instructions for the underlying offenses include the requisite mental state").

{¶ 35} There was ample evidence at trial that Webster had the requisite criminal intent for the charged offenses. *See* R.C. 2923.03(A)(2) (stating "[n]o person, *acting with the kind of culpability required for the commission of the offense*, shall * * * [a]id or abet another in committing the offense") (emphasis added). Thus, Webster is not able to demonstrate the necessary prejudice from the trial court's complicity instruction under the plain error standard. Accordingly, we overrule Webster's first assignment of error.

## IV.  Second Assignment of Error – Ineffective Assistance of Counsel

{¶ 36}  In his second assignment of error, Webster argues he received the ineffective assistance of counsel. More specifically, Webster asserts his trial counsel was ineffective in failing to make certain objections, failing to move to sever his case from his codefendant's case, and failing to move for a continuance or mistrial.

{¶ 37} In order to prevail on a claim of ineffective assistance of counsel, Webster must satisfy a two-prong test. First, he must demonstrate that his counsel's performance was deficient. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). This first prong requires Webster to show that his counsel committed errors which were "so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* If Webster can so demonstrate, he must then establish that he was prejudiced by the deficient performance. *Id.* To show prejudice, Webster must establish there is a reasonable probability that, but for his counsel's errors, the result of the trial would have been different. A "reasonable probability" is one sufficient to undermine confidence in the outcome of the trial. *Id.* at 694.

{¶ 38} In considering claims of ineffective assistance of counsel, courts indulge in a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. *State v. Conway*, 109 Ohio St.3d 412, 2006-Ohio-2815, ¶ 101. Webster contends his trial counsel was ineffective in (1) failing to object to the complicity instruction; (2) failing to move to sever his trial from Moore's trial; (3) failing to object to the prosecutor's opening statement; (4) failing to request a continuance or move for a mistrial after the state located a witness in the middle of trial; (5) failing to object to leading questions; (6) failing to object to other-acts evidence; (7) failing to object to the *Howard* charge to the jury; and (8) failing to object to the bailiff's communications with the jury. Additionally, Webster asserts the cumulative effect of counsel's alleged errors rendered his trial counsel ineffective.

### A.  Failing to Object to Complicity Instruction

{¶ 39} Webster's first allegation of ineffective assistance of counsel is his trial counsel's failure to object to the complicity instruction. To succeed on a claim of ineffective assistance of counsel based on counsel's failure to file an objection, an appellant must demonstrate that the objection had a reasonable probability of success. *State v. Jones*, 10th Dist. No. 18AP-33, 2019-Ohio-2134, ¶ 52, citing *State v. Johns*, 10th Dist. No. 11AP-203, 2011-Ohio-6823, ¶ 25. Additionally, to show prejudice under the second prong of the *Strickland* test based on counsel's lack of objection, an appellant must establish a reasonable probability that the result of the trial would have been different had counsel made the objection. *State v. Messenger*, 10th Dist. No. 19AP-879, 2021-Ohio-2044, ¶ 72.

{¶ 40} Webster's argument reflects the argument he made under his first assignment of error on appeal. Because trial counsel failed to object to the trial court's jury instructions, we reviewed Webster's first assignment of error under a plain error standard, and, in disposing of that argument, we concluded Webster was unable to demonstrate plain error. " '[W]here the failure to object does not constitute plain error, the issue cannot be reversed by claiming ineffective assistance of counsel.' " *State v. Roy*, 10th Dist. No. 14AP-223, 2014-Ohio-4587, ¶ 20, quoting *State v. Carson*, 10th Dist. No. 05AP-13, 2006-Ohio-2440, ¶ 51. In addressing Webster's first assignment of error, we held that the trial court did not plainly err when it instructed the jury on complicity because Webster could not conclude the outcome of the trial clearly would have been different had the trial court

provided a different instruction on complicity. Similarly, we conclude Webster's argument regarding the complicity instruction as it relates to a claim of ineffective assistance of counsel fails to satisfy the second prong of the *Strickland* test as Webster does not establish a reasonable probability that the result of the trial would have been different had his counsel objected to the instruction. *See State v. Mankin*, 10th Dist. No. 19AP-650, 2020-Ohio-5317, ¶ 30. As Webster cannot show the required prejudice under the second prong of the *Strickland* test, his trial counsel's failure to object to the complicity instruction does not amount to ineffective assistance of counsel.

### B. Failing to Move to Sever the Trial from the Codefendant's Trial

{¶ 41} Webster's second allegation of ineffective assistance of counsel is his trial counsel's failure to move to sever his trial from his codefendant's trial. To succeed on a claim of ineffective assistance of counsel based on trial counsel's failure to file a motion, an appellant must show (1) the motion was meritorious or likely to be granted, and (2) a reasonable probability that the verdict would have been different had counsel made the motion. *State v. Massey*, 10th Dist. No. 12AP-649, 2013-Ohio-1521, ¶ 14, citing *State v. Simms*, 10th Dist. No. 10AP-1063, 2012-Ohio-2321, ¶ 50, citing *State v. Raver*, 10th Dist. No. 02AP-604, 2003-Ohio-958, ¶ 63. " 'Counsel is not deficient for failing to raise a meritless issue.' " *State v. Neil*, 10th Dist. No. 14AP-981, 2016-Ohio-4762, ¶ 53, quoting *Massey* at ¶ 13.

{¶ 42} Pursuant to Crim.R. 8(B), two or more codefendants may be charged in the same indictment "if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses, or in the same course of criminal conduct." *See also State v. Klinkner*, 10th Dist. No. 13AP-469, 2014-Ohio-2022, ¶ 18. "As a general rule, the law favors joinder of trials because, among other reasons, it conserves judicial resources and reduces the possibility of incongruous results before different juries." *Id.*, citing *State v. Walters*, 10th Dist. No. 06AP-693, 2007-Ohio-5554, ¶ 21. However, under Crim.R. 14, a defendant may move for severance from a codefendant's trial upon a showing of prejudice. *Klinkner* at ¶ 18, citing *State v. Lott*, 51 Ohio St.3d 160, 163 (1990); *State v. Pippins*, 10th Dist. No. 15AP-137, 2020-Ohio-503, ¶ 63.

{¶ 43} Webster argues that his trial counsel was ineffective for failing to move for severance under Crim.R. 14 because Moore and Webster presented mutually antagonistic

defenses. "One example of prejudice from improper joinder of defendants for trial is mutually antagonistic defenses, which are cases in which defendants seek to exculpate themselves at the cost of inculpating co-defendants." *Pippins* at ¶ 64, citing *State v. Walters*, 10th Dist. No. 06AP-693, 2007-Ohio-5554, ¶ 23-27, citing *Zafiro v. United States*, 506 U.S. 534, 538-39 (1993). To show prejudice under Crim.R. 14 and merit severance, the defenses "must be antagonistic to the point of being irreconcilable and mutually exclusive." *Klinkner* at ¶ 19, citing *State v. Miller*, 10th Dist. No. 11AP-899, 2013-Ohio-1242, ¶ 52, citing *Walters* at ¶ 23.

{¶ 44} Webster asserts that Moore's defense strategy was to blame Webster for the events. However, a review of the record indicates that Webster mischaracterizes the defenses the codefendants presented at trial. Both Moore and Webster denied any involvement in the offenses. Though Moore's counsel noted Moore was not in the same general group as Webster, Anderson, Radabaugh, and Hassan, Moore did not present a defense placing the blame on Webster or attempt to inculpate Webster so as to exculpate himself. Instead, both Moore and Webster denied any involvement in the offense and sought to undermine the credibility of the testifying witnesses. Thus, Webster's and Moore's defenses were not antagonistic to the point of being "irreconcilable and mutually exclusive," and Webster cannot show the kind of prejudice that Crim.R. 14 requires in order to merit severance. *Walters* at ¶ 23; *Klinkner* at ¶ 19-20.

{¶ 45} It is also conceivable that Webster's trial counsel's decision not to request a separate trial was a strategic decision. Strategic and tactical decisions of counsel, even if ultimately unsuccessful, cannot form the basis of a claim of ineffective assistance of counsel. *Columbus v. Oppong*, 10th Dist. No. 15AP-1059, 2016-Ohio-5590, ¶ 30, citing *State v. Harris*, 10th Dist. No. 15AP-683, 2016-Ohio-3424, ¶ 61. Webster's trial counsel may have had a strategic reason not to request a separate trial, including a hope that the jury may not find him guilty of all the offenses if it had the option to convict Moore instead. *State v. Jennings*, 10th Dist. No. 09AP-70, 2009-Ohio-6840, ¶ 126 ("Jennings' trial counsel may well have had a strategic reason for not seeking severance, perhaps finding some benefit in the pooled resources of a joint trial.").

{¶ 46} Additionally, Webster argues he was prejudiced by the joint trial when the state introduced statements Moore made during the incident, asserting the introduction of

Moore's statements violated Webster's Sixth Amendment right of confrontation. Specifically, Webster points to Anderson's testimony that Moore told Dodda he would have to shoot one of the men and Radabaugh's testimony that Moore told him after the shooting that the job was done. A confrontation clause problem arises from the statement of a codefendant at a joint trial "only when the trial court admits into evidence a non-testifying defendant's statement that implicates the other defendant in criminal activity." *Walters* at ¶ 27, citing *Bruton v. United States*, 391 U.S. 123 (1968). Here, however, the statements Webster complains of did not implicate Webster and instead related to Moore's own conduct throughout the events. Thus, the statements did not create a *Bruton* rule confrontation clause issue and did not warrant severance of the codefendants' trials. *See Jennings* at ¶ 79 (noting "[t]he *Bruton* analysis requires an appellate court to consider whether the contested out-of-court statement is incriminating to the defendant on its face").

{¶ 47} For these reasons, Webster does not demonstrate that a motion for severance under Crim.R. 14 was likely to be granted. *Massey* at ¶ 14. Accordingly, his trial counsel's failure to move for severance does not constitute ineffective assistance of counsel.

### C. Failing to Object to Opening Statement

{¶ 48} Webster's third allegation of ineffective assistance of counsel is his trial counsel's failure to object to the prosecutor's improper remarks during opening statement. The test for prosecutorial misconduct based on a prosecutor's statements to the jury "is whether the remarks were improper and, if so, whether they prejudicially affected substantial rights of the defendant." *State v. Smith*, 14 Ohio St.3d 13, 14 (1984), citing *United States v. Dorr*, 636 F.2d 117 (5th Cir.1981). " '[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor.' " *State v. Wilkerson*, 10th Dist. No. 01AP-1127, 2002-Ohio-5416, ¶ 38, quoting *Smith v. Phillips*, 455 U.S. 209, 219 (1982).

{¶ 49} Here, the prosecutor stated:

> You guys drew a pretty rough case to sit on. You're going to have to hear a lot of things that are hard to hear, disturbing things. You're going to have to see some photographs that are going to be hard to look at of the scene, what happened to these men.

> It's a disturbing case. It's a scary case. It's a senseless case. More than anything, it's a sad case, and it's a tragic case.
>
> * * *
>
> And all of this damage that occurred isn't limited to those five people. There's a ripple effect that happens. The families of these victims, the loved ones of these victims, the neighbors of these victims, and our community as a whole are all affected when actions like this take place.

(Tr. Vol. 2 at 263-64.) Webster contends the prosecutor's statement improperly inflamed the passion and prejudice of the jury by appealing to its desire to address a community problem. *See State v. Presley*, 10th Dist. No. 02AP-1354, 2003-Ohio-6069, ¶ 90 (" '[p]rosecutors should not appeal to public sentiment * * * by urging the jurors to protect society, protect community values, preserve civil order, or deter future lawbreaking' "), quoting *State v. Loch*, 10th Dist. No. 02AP-1065, 2003-Ohio-4701, ¶ 67, citing *State v. Spirko*, 59 Ohio St.3d 1, 13 (1991). *State v. Draughn*, 76 Ohio App.3d 664, 671 (5th Dist.1992) (holding a prosecutor "may not invite the jury to judge the case upon standards or grounds other than the evidence and law of the case," and "cannot inflame the passion and prejudice of the jury by appealing to community abhorrence or expectations with respect to crime in general, or crime of the specific type involved in the case"), citing *United States v. Solivan*, 937 F.2d 1146 (6th Cir.1991).

{¶ 50} Even assuming, for purposes of argument, that the prosecutor's statements were improper, it does not necessarily follow that Webster's counsel was deficient in failing to object to the prosecutor's statements. Counsel may choose, as a tactical decision, not to object to the prosecutor's opening statement even if the prosecutor has engaged in prosecutorial misconduct. *State v. Shine-Johnson*, 10th Dist. No. 17AP-194, 2018-Ohio-3347, ¶ 121, citing *State v. Gumm*, 73 Ohio St.3d 413, 428 (1995) (defense counsel's failure to object to prosecutorial misconduct "does not constitute ineffective assistance of counsel per se, as that failure may be justified as a tactical decision"). Moreover, Webster does not identify how he was prejudiced by the prosecutor's statement other than to assert generally that the statement must have affected the jury. However, the trial court instructed the jury that opening and closing statements were not evidence and further instructed the jury to

make their findings "without bias, sympathy, or prejudice." (Tr. Vol. 6 at 1243.) The jury is presumed to follow these instructions. *State v. Fudge*, 10th Dist. No. 16AP-821, 2018-Ohio-601, ¶ 52 (where appellant alleges prosecutorial misconduct based on the prosecutor's statements to the jury, the appellant was not denied a fair trial as the trial court instructed the jury that opening and closing arguments are not evidence), citing *State v. Thompson*, 3d Dist. No. 7-16-10, 2017-Ohio-792, ¶ 26, citing *Pang v. Minch*, 53 Ohio St.3d 186, 187 (1990). Thus, the failure of Webster's trial counsel to object to the prosecutor's statements does not substantiate a claim for ineffective assistance of counsel.

### D.  Failing to Request Continuance or Move for Mistrial

{¶ 51} Webster's fourth allegation of ineffective assistance of counsel is his trial counsel's failure to request a continuance or move for a mistrial when, after trial had already commenced, the state announced it had located Omar in Immigration Customs Enforcement ("ICE") custody and planned to call him to testify. There is no dispute that the state had included Omar on its witness list during discovery, and, upon learning the state would call Omar to testify, trial counsel took time to discuss the matter with Webster before announcing to the court that Webster "would like to just continue with his trial." (Tr. Vol. 3 at 453.) Nonetheless, Webster now categorizes Omar as a surprise witness and asserts his counsel should have moved for a continuance or declared a mistrial.

{¶ 52} The decision whether to request a continuance after learning of surprise evidence or a surprise witness is a matter of trial strategy. *State v. Ali*, 10th Dist. No. 18AP-935, 2019-Ohio-3864, ¶ 44, citing *State v. Bailey*, 10th Dist. No. 04AP-553, 2005-Ohio-4068, ¶ 26 (failing to request a continuance after surprise witness testimony did not amount to ineffective assistance of counsel as it fell within the realm of a strategic and tactical decision). Similarly, "[t]he decision not to request a mistrial is one of trial strategy best left to trial counsel." *State v. Zeune*, 10th Dist. No. 10AP-1102, 2011-Ohio-5170, ¶ 37, citing *State v. Seiber*, 56 Ohio St.3d 4, 12 (1990). This court will not lightly second-guess such strategic decisions. *Id.*, citing *Seiber* at 12.

{¶ 53} Webster asserts his trial counsel should have requested a continuance or mistrial in the hopes that ICE would have acted to deport Omar, thereby preventing his testimony. Other than this highly speculative suggestion, Webster does not assert that Omar's presence at trial rendered his trial unfair or demonstrate that the trial court would

have granted a continuance or mistrial had his counsel so moved. *See State v. Drayer*, 159 Ohio App.3d 189, 2004-Ohio-6120, ¶ 24 (10th Dist.) ("[a] mistrial is an extreme remedy, 'declared only when the ends of justice so require and a fair trial is no longer possible' "), quoting *State v. Franklin*, 62 Ohio St.3d 118, 127 (1991). That Omar's testimony was not favorable to Webster does not render Webster's trial unfair. Webster's defense all through trial was a denial of involvement. He does not articulate how Omar's testimony, or the lack thereof, would have changed that defense, let alone changed the outcome of trial. There is nothing in the record demonstrating that there is a reasonable probability that the result of the proceedings would have been different if trial counsel had requested a continuance or mistrial. *Ali* at ¶ 45, citing *Bailey* at ¶ 27. Thus, Webster's trial counsel's failure to request a continuance or move for a mistrial does not amount to ineffective assistance of counsel.

### E. Failing to Object to Leading Questions

{¶ 54} Webster's fifth allegation of ineffective assistance of counsel is his trial counsel's failure to object to leading questions during Radabaugh's testimony on direct examination. "Because a trial court has broad discretion in allowing leading questions, counsel's decision not to object is within the realm of trial strategy." *State v. Jones*, 10th Dist. No. 18AP-33, 2019-Ohio-2134, ¶ 59, citing *State v. Edwards*, 10th Dist. No. 10AP-681, 2011-Ohio-3157, ¶ 16. "Thus, an appellate court 'need not second-guess the decision of appellant's defense counsel to not object to leading questions.' " *Id.*, quoting *Edwards* at ¶ 16; *see also State v. Jackson*, 92 Ohio St.3d 436, 449 (2001) (declining to find ineffective assistance of counsel from trial counsel's failure to object to the state's excessive leading questioning). Further, had trial counsel objected to any of the state's leading questions, "the state could have simply rephrased" the questions following the objection. *Jones* at ¶ 60 (finding any objections to leading questioning would not have had a reasonable probability of success), citing *Edwards* at ¶ 17. Accordingly, Webster's trial counsel was not deficient in failing to object to the state's occasional leading questioning.

### F. Eliciting Testimony of Other-Acts Evidence

{¶ 55} Webster's sixth allegation of ineffective assistance of counsel is his trial counsel's eliciting testimony from Anderson regarding other-acts evidence. Specifically, Anderson testified on cross-examination that he changed his story to police after receiving information that made him believe Webster had threatened his family. Webster construes

this testimony as impermissible other-acts evidence under Evid.R. 404(B) and argues his counsel should not have permitted the jury to hear it.  *See* Evid.R. 404(B) ("[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith").  However, as the Supreme Court of Ohio recently reiterated, "while evidence showing the defendant's character or propensity to commit crimes or acts is forbidden, evidence of other acts is admissible when the evidence is probative of a separate, nonpropensity-based issue." *State v. Hartman*, 161 Ohio St.3d 214, 2020-Ohio-4440, ¶ 22, citing Evid.R. 404(B).  Here, we do not agree with Webster that Anderson's testimony was admitted to prove his character or propensity to commit other crimes or acts.  Instead, the testimony, in context, related to why Anderson changed his story to police.

{¶ 56} Additionally, when read in context, Webster's counsel used this line of questioning in order to undermine Anderson's credibility, ultimately getting Anderson to admit to inconsistencies in his story.  Thus, even if we were to construe this testimony as impermissible propensity evidence under Evid.R. 404(B), counsel's decision to elicit this testimony was likely a strategic decision to undermine Anderson's credibility.  *See Messenger* at ¶ 68 ( counsel's decision not to object to the search warrant affidavit was likely a strategic decision to not call attention to the unfavorable evidence).  This strategic decision will not form the basis of a claim of ineffective assistance of counsel.  *Oppong* at ¶ 30.

### G.  Failing to Object to *Howard* Charge

{¶ 57} Webster's seventh allegation of ineffective assistance of counsel is his counsel's failure to object to the *Howard* charge given to the jury.  *See State v. Howard*, 42 Ohio St.3d 18 (1989).  After the first full day of deliberations, the jury wrote to the trial court that it was unable to reach a unanimous decision on several counts.  The trial court responded in writing to the jury to "please keep deliberating in an effort to reach a unanimous decision on the counts that are not yet decided."  (Tr. Vol. 7 at 1260.)  The next day, the jury again wrote to the trial court to "inform the court that the jury is hung on a number of counts.  The jury is of the opinion that it will not reach a unanimous vote as to the same."  (Tr. Vol. 8 at 1265.)  With the agreement of counsel for both parties, the trial court then provided the *Howard* charge to the jury. Subsequently, after further

deliberations, the jury indicated it had reached a verdict on all counts. Webster now argues his counsel should have objected to the *Howard* charge in the hopes that the jury could not reach a unanimous decision.

{¶ 58} "[T]he *Howard* charge ' "is intended for a jury that believes it is deadlocked, so as to challenge them to try one last time to reach a consensus." ' " *State v. Norman*, 10th Dist. No. 12AP-505, 2013-Ohio-1908, ¶ 42, quoting *State v. Brown*, 100 Ohio St.3d 51, 2003-Ohio-5059, ¶ 38, quoting *State v. Robb*, 88 Ohio St.3d 59, 81 (2000). "Whether the jury is irreconcilably deadlocked is essentially ' "a necessarily discretionary determination" ' for the trial court to make." *Norman* at ¶ 41 (noting trial courts weighing the *Howard* charge must evaluate circumstances specific to each individual case), quoting *Brown* at ¶ 37, quoting *Arizona v. Washington*, 434 U.S. 497, 510 (1978), fn. 28. Webster does not argue that the trial court abused its discretion in giving the *Howard* charge; instead, he merely asserts his counsel should not have agreed to the *Howard* charge because of the jury's ultimate verdict. Because the trial court acted within its discretion in giving the *Howard* charge, an objection to the *Howard* charge did not have a reasonable probability of success. Thus, Webster's counsel was not deficient in agreeing to the *Howard* charge.

**H. Failing to Object to the Bailiff's Communications with the Jury**

{¶ 59} Webster's eighth allegation of ineffective assistance of counsel is his trial counsel's failure to object to the bailiff's communications with the jury. Pursuant to R.C. 2945.33:

> When a case is finally submitted the jurors must be kept together in a convenient place under the charge of an officer until they agree upon a verdict, or are discharged by the court. The court, except in cases where the offense charged may be punishable by death, may permit the jurors to separate during the adjournment of court overnight, under proper cautions, or under supervision of an officer. Such an officer shall not permit a communication to be made to them, nor make any himself, except to ask if they have agreed upon a verdict, unless he does not by order of the court. Such officer shall not communicate to any person, before the verdict is delivered, any matter in relation to their deliberation.

Here, Webster argues the bailiff violated R.C. 2945.33 when she engaged in two separate communications with the jury.

{¶ 60} The first communication occurred when, during deliberations, the jury asked the bailiff "what happens if we have charges that we can't reach an agreement on." (Tr. Vol. 7 at 1256.) The bailiff responded that she could not answer the question, and at the trial court's instructions, the bailiff then told the jury to reduce the question to writing for submission to the court. R.C. 2945.33 provides that an officer of the court shall not make any communication to the jury "unless he does so by order of the court." *See also State v. Adams*, 141 Ohio St. 423, 430-31 (1943) ("the bailiff shall not, unless by order of the court, make any communication to the jurors"). As to the first communication, the bailiff appropriately stated she could not answer the jury's questions, informed the trial court, and, upon the trial court's authorization, instructed the jury to submit a written question. Thus, the first communication did not violate R.C. 2945.33. *See State v. DiPietro*, 10th Dist. No. 09AP-202, 2009-Ohio-5854, ¶ 15 (bailiff's conduct did not violate R.C. 2945.33 where the trial court ordered the communication from the bailiff to the jury).

{¶ 61} The second communication related to whether the jury should return to court to announce its verdict that day or adjourn for the evening and announce its verdict the next morning. Specifically, the trial court received a note from the jury stating "[t]he jury has reached a verdict on all counts, but we would like to finish for the day because one juror has an important medical appointment this evening. Return tomorrow at 11 a.m. and begin court at 11:30." (Tr. Vol. 8 at 1272.) After some discussion with counsel for both parties, the trial court decided to advise the jury it could adjourn that evening and be reminded of their admonition. However, a few minutes later, the bailiff relayed the following discussion with the jury to the court:

> One of them had something to do in the morning, and that's why they couldn't come in. So I said, well, we can do it now; everybody's here.
>
> And the one guy said, well, I have a doctor's appointment.
>
> I said, what time.
>
> He said 6:30.

I said it's two and a half hours [from now].

He goes, well, it's just blood work; I can do it in the morning;
let's just do it now.

(Tr. Vol. 8 at 1276.) Thereafter, with the agreement of the parties, the trial court called the jury into the courtroom to announce its verdict. Webster asserts this communication between the bailiff and the jury violated R.C. 2945.33 and warranted an objection from his trial counsel.

{¶ 62} As Webster notes, the court did not authorize the bailiff's discussion with the jurors about scheduling. "Misconduct of a court officer, including a bailiff, in communicating to the jury during its deliberations 'will be presumed to be prejudicial to a defendant against whom, after such communication, a verdict is returned by such jury.' " *DiPietro* at ¶ 16, quoting *Adams* at paragraph three of the syllabus. As a general rule, therefore, court personnel's unauthorized communication with the jury in the defendant's absence may be grounds for a new trial. *DiPietro* at ¶ 16, citing *State v. Abrams*, 39 Ohio St.2d 53, 55-56 (1974). However, the presumption of prejudice is not conclusive. *Id.* Instead, the burden shifts and " ' "rests heavily upon the Government to establish, after notice to and hearing of the defendant, that such contact with the juror was harmless to the defendant." ' " (Internal quotation marks omitted.) *Id.*, quoting *State v. Murphy*, 65 Ohio St.3d 554, 575 (1992), quoting *Remmer v. United States*, 347 U.S. 227, 229 (1954).

{¶ 63} In determining whether the communication from court personnel to the deliberating jury resulted in prejudice, the court must examine both the nature and content of the communication. *DiPietro* at ¶ 17, citing *Murphy* at 575. "The presumption of prejudice from *Adams* does not arise if the court's communication with the jury is not substantive in nature." *Id.*, citing *State v. Allen*, 73 Ohio St.3d 626, 630 (1995). "A statement of the trial court or its official is not substantive if it does not address any legal issues, any fact in controversy, any law applicable to the case, or some similar matter." *Id.*, citing *State v. Cook*, 10th Dist. No. 05AP-515, 2006-Ohio-3443, ¶ 36.

{¶ 64} Here, the second communication involved the timing of delivering the verdict that the jury had stated it had already reached; it did not involve a substantive matter. *DiPietro* at ¶ 18 ("[s]tatements concerning the status of deliberations generally are

procedural rather than substantive"), citing *State v. Robinson*, 12th Dist. No. CA2005-11-029, 2007-Ohio-354, ¶ 41 (finding bailiff's question to jurors "regarding whether they intended to continue to deliberate or retire for the evening, was merely procedural and did not involve substantive issues of the case or in any way relate to appellant's guilt or innocence").  As the second communication did not involve a substantive issue, the presumption of prejudice from the communication does not arise.  *Id.*  Thus, given the nature of the communications between the bailiff and the jury, Webster cannot show his trial counsel was deficient in failing to object.

### I.  Cumulative Effect of Errors

{¶ 65} Webster finally argues that even if we conclude none of the above alleged errors are sufficient to find ineffective assistance of counsel standing alone, the cumulative effect of these errors nonetheless resulted in Webster being denied a fair trial.

{¶ 66} Webster relies on *State v. DeMarco*, 31 Ohio St.3d 191 (1987), for the proposition that although errors at trial singularly "may not rise to the level of prejudicial error, a conviction will be reversed where the cumulative effect of the errors deprives a defendant of the constitutional right to a fair trial."  *Id.* at paragraph two of the syllabus. Webster urges us to conclude that his trial counsel's many alleged errors, when considered together, deprived him of a fair trial.

{¶ 67} In considering Webster's eight alleged instances of ineffective assistance of counsel, we noted that many of his allegations failed to satisfy the first prong of the *Strickland* test and did not rise to the level of deficient performance.  Moreover, even if we were to agree with Webster for the sake of argument that his counsel's overall performance was deficient under the first prong of *Strickland*, we are constrained by the second prong of *Strickland* which requires Webster to demonstrate that but for his counsel's performance, the outcome of the proceedings would have been different.  Here, although Webster complains about his trial counsel's various failures to object and make certain motions, he does not articulate how any of those objections or motions would have caused the jury to reach a different conclusion.  Thus, because Webster is unable to demonstrate the requisite prejudice under the second prong of *Strickland*, the cumulative effect of the alleged errors did not deprive him of a fair trial.  *Messenger* at ¶ 77, citing *State v. Hughes,* 10th Dist. No. 14AP-360, 2015-Ohio-151 ¶ 74.

{¶ 68} For these reasons, Webster is unable to demonstrate he received the ineffective assistance of counsel.  We overrule Webster's second assignment of error.

## V.  Third Assignment of Error – Sufficiency and Manifest Weight of the Evidence

{¶ 69}  In his third and final assignment of error, Webster argues there was insufficient evidence to support his convictions and that his convictions are against the manifest weight of the evidence.

### A.  Sufficiency of the Evidence

{¶ 70}  Whether there is legally sufficient evidence to sustain a verdict is a question of law.  *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997).  Sufficiency is a test of adequacy. *Id.*  The relevant inquiry for an appellate court is whether the evidence presented, when viewed in a light most favorable to the prosecution, would allow any rational trier of fact to find the essential elements of the crime proven beyond a reasonable doubt.  *State v. Mahone*, 10th Dist. No. 12AP-545, 2014-Ohio-1251, ¶ 38, citing *State v. Tenace*, 109 Ohio St.3d 255, 2006-Ohio-2417, ¶ 37.

{¶ 71}  Though Webster captions his argument as a challenge to both the sufficiency and manifest weight of the evidence, his entire argument under this assignment of error relates to the credibility of the witnesses.  However, " 'in a sufficiency of the evidence review, an appellate court does not engage in a determination of witness credibility; rather, it essentially assumes the state's witnesses testified truthfully and determines if that testimony satisfies each element of the crime.' "  *State v. Connally*, 10th Dist. No. 16AP-53, 2016-Ohio-7573, ¶ 38, quoting *State v. Bankston*, 10th Dist. No. 08AP-668, 2009-Ohio-754, ¶ 4.  Webster does not allege the state failed to present evidence on any of the elements in any of the 17 charges of which he was convicted but instead argues the evidence the state relied on to prove he was the perpetrator lacked credibility.  Thus, we will address Webster's arguments related to the credibility of witnesses under our review of the manifest weight of the evidence.  *Id.*; *State v. Cervantes*, 10th Dist. No. 18AP-505, 2019-Ohio-1373, ¶ 33, citing *State v. Sieng*, 10th Dist. No. 18AP-39, 2018-Ohio-5103, ¶ 51.

### B.  Manifest Weight of the Evidence

{¶ 72}  When presented with a manifest weight argument, an appellate court engages in a limited weighing of the evidence to determine whether sufficient competent,

credible evidence supports the jury's verdict. *State v. Salinas*, 10th Dist. No. 09AP-1201, 2010-Ohio-4783, ¶ 32, citing *Thompkins* at 387. "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a 'thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony." *Thompkins* at 387, quoting *Tibbs v. Florida*, 457 U.S. 31, 42 (1982). Determinations of credibility and weight of the testimony are primarily for the trier of fact. *State v. DeHass*, 10 Ohio St.2d 230 (1967), paragraph one of the syllabus. Thus, the jury may take note of the inconsistencies and resolve them accordingly, "believ[ing] all, part, or none of a witness's testimony." *State v. Raver*, 10th Dist. No. 02AP-604, 2003-Ohio-958, ¶ 21, citing *State v. Antill*, 176 Ohio St. 61, 67 (1964).

{¶ 73} An appellate court considering a manifest weight challenge "may not merely substitute its view for that of the trier of fact, but must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Harris*, 10th Dist. No. 13AP-770, 2014-Ohio-2501, ¶ 22, citing *Thompkins* at 387. Appellate courts should reverse a conviction as being against the manifest weight of the evidence only in the most " 'exceptional case in which the evidence weighs heavily against the conviction.' " *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983).

{¶ 74} Webster argues his convictions are against the manifest weight of the evidence because the witnesses' testimony was not credible. First, Webster argues both Radabaugh and Anderson were not credible because they testified as part of plea agreements for their involvement in the same series of events. However, it is within the province of the jury to believe Radabaugh's and Anderson's testimony in spite of their admitted involvement in the offenses and plea agreements with the state. *Connally* at ¶ 41, citing *State v. Berry*, 10th Dist. No. 10AP-1187, 2011-Ohio-6452, ¶ 18 (noting the jury is in the best position to assess the credibility of a codefendant), citing *State v. Woodward*, 10th Dist. No. 03AP-398, 2004-Ohio-4418, ¶ 20. Defense counsel had ample opportunity on cross-examination to highlight Radabaugh's and Anderson's plea agreements. Neither Radabaugh's nor Anderson's testimony was "so incredible as to render appellant's

convictions against the manifest weight of the evidence." *Berry* at ¶ 18, citing *State v. Thompson*, 10th Dist. No. 07AP-491, 2008-Ohio-2017, ¶ 35.

{¶ 75} Additionally, Radabaugh, Anderson, and Omar all provided similar accounts of how the events transpired. Though Webster argues each of these witnesses provided inconsistent testimony and changed their stories to police, the jury may take note of inconsistencies and resolve them accordingly. *Raver* at ¶ 21. We are also mindful that the jury was able to consider Webster's attempt to evade arrest by fleeing the state and hiding in the trunk of the car as probative of his consciousness of guilt. *State v. Davenport*, 10th Dist. No. 18AP-393, 2019-Ohio-2297, ¶ 44 (" 'an accused's flight, escape from custody, resistance to arrest, concealment, assumption of a false name, and related conduct, are admissible as evidence of consciousness of guilt, and thus of guilt itself' "), quoting *State v. Hand*, 107 Ohio St.3d 378, 2006-Ohio-18, ¶ 167.

{¶ 76} Finally, Webster notes the lack of physical evidence connecting him to the crimes. However, "a lack of physical evidence, standing alone, does not render [a defendant's] conviction against the manifest weight of the evidence." *State v. Peeples*, 10th Dist. No. 13AP-1026, 2014-Ohio-4064, ¶ 21, citing *State v. Conner*, 10th Dist. No. 12AP-698, 2013-Ohio-2773, ¶ 12, citing *State v. Shedwick*, 10th Dist. No. 11AP-709, 2012-Ohio-2270, ¶ 32. " 'If [witness] testimony is believed then the lack of fingerprints, DNA, footprints or any other physical evidence does not render the conviction against the manifest weight of the evidence.' " *Peeples* at ¶ 21, quoting *State v. Jackson*, 7th Dist. No. 09 JE 13, 2009-Ohio-6407, ¶ 16 (concluding a conviction based on victim's testimony identifying the defendant was not against the manifest weight of the evidence despite the lack of physical evidence). Anderson, Radabaugh, and Omar all identified Webster as the leader of the offenses. Considering all the evidence, we cannot say the jury lost its way in believing the testimony of Anderson, Radabaugh, and Omar.

{¶ 77} Thus, in light of the evidence discussed above, as well as the record in its entirety, we find the jury did not clearly lose its way in finding Webster guilty of the 17 offenses. After an independent review of the record, we find sufficient evidence to support Webster's convictions, and Webster's convictions are not against the manifest weight of the evidence. We overrule Webster's third and final assignment of error.

## VI. Disposition

{¶ 78} Based on the foregoing reasons, the trial court did not plainly err in instructing the jury on aiding and abetting, Webster did not receive the ineffective assistance of counsel, and the sufficiency of the evidence and the manifest weight of the evidence support Webster's convictions of aggravated burglary, kidnapping, aggravated murder, murder, felonious assault, having weapons while under disability and the accompanying firearm specifications. Having overruled Webster's three assignments of error, we affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

MENTEL, J., concurs.
NELSON, J., concurs in judgment only.

NELSON, J., retired, formerly of the Tenth Appellate District,
assigned to active duty under authority of Ohio Constitution,
Article IV, Section 6(C).

NELSON, J., concurring in judgment only.

{¶ 79} I concur in the judgment of this court, and write to elaborate a bit on the first assignment of error (which I understand Webster's lawyer to have confirmed at oral argument is cabined to the shooting counts only, *see also* Reply Brief at 4-5). It does seem to me, and the majority does not say otherwise, that the trial court erred in omitting the mens rea element from its complicity instruction. As spelled out in the discussion of aggravated burglary and then applied by generic reference to all other counts, the charge apprised the jury that Webster could be convicted on a complicity theory if he aided, assisted, or encouraged another in the crime and "participate[d] in the commission of the offense by some act, word, or gesture" (beyond mere presence at the scene). Tr. at 1212. That instruction on its own and in a vacuum could permit conviction without regard to a defendant's state of mind, and does not require reference to the "purpose" element of the underlying charges. (Suggesting that the victims be bound, for example, could contribute to their murders even without that design.) As the majority notes, the law on complicity in Ohio is that the complicitor must have " 'shared the criminal intent of the principal,' " *supra* at ¶ 29, citing *State v. Johnson*, 93 Ohio St.3d 240, 245-46 (2001) (emphasis omitted), yet the instructions here oddly did not include that element. Formulations of the Ohio Jury

Instructions certainly are not binding, *see supra* at ¶ 31, but the OJI suggestion is entirely serviceable and properly encapsulates the required mens rea element.

{¶ 80} Under different circumstances, I believe, such an omission could rise to the level of plain error. After all, as Justice Scalia repeatedly emphasized, "[t]he [Sixth Amendment to the federal] Constitution gives a criminal defendant the right to demand that a jury find him guilty of all the elements of the crime with which he is charged[.]" *United States v. Gaudin*, 515 U.S. 506, 511 (1995); *Sullivan v. Louisiana*, 508 U.S. 275, 277-78 (1993) ("The prosecution bears the burden of proving all elements of the offense charged, * * * and must persuade the factfinder 'beyond a reasonable doubt' of the facts necessary to establish each of those elements") (citations omitted). *Compare, e.g., State v. Adams*, 62 Ohio St.2d 151, 153 (1980) ("As a general rule, a defendant is entitled to have the jury instructed on all elements that must be proved to establish the crime with which he is charged"); *State v. Bethel*, 4th Dist. No. 13CA11, 2014-Ohio-3861, ¶ 12, 13 (different instruction: "We have previously found plain error where the jury did not receive an instruction on an essential element of the offense"; "court's failure to submit * * * essential element to the jury caused a manifest injustice because it deprived Bethel of his right to have the jury decide that issue beyond a reasonable doubt" [collecting cases]).

{¶ 81} Here, however, under the particular circumstances of this case with no objection lodged and given the jury instructions in their entirety, I see no miscarriage of justice arising from the complicity instruction. Significantly, the jury convicted Webster not only of murder, but of aggravated murder as undertaken with prior calculation and design (Counts 4 and 10). The trial court told the jury: "Before you can find *either* defendant guilty of aggravated murder as [so charged], you must find beyond a reasonable doubt that * * * *the defendant* purposely, and with prior calculation and design, caused the death" of the murder victims. Tr. at 1223-26 (emphasis added). Given the particular structure and phrasing of these instructions, I do not conclude that the complicity instruction (relevant here to who pulled the trigger) created ambiguity as to the prior calculation and design element of the aggravated murder charges with its specification that the defendant himself "engag[ed] in a distinct process of reasoning" by which he "form[ed] a purpose to kill and plan[ned] the method intended to be used to cause death." *See id.* at 1223 (defining "prior calculation and design"); *see also id.* at 1224 (noting that the

difference between these counts of aggravated murder and murder is that "murder does not require prior calculation and design").

{¶ 82} That is, given the *particular* wording and the structure and nature of the prior calculation and design instruction in the context of the entire jury charge, I do not believe that the complicity instruction obviates the mens rea aspect of those aggravated murder counts in the way that it might with respect to the unadorned murder counts; further, because the requisite calculation and design is to kill, the instruction adequately informs the jury of that purpose element with regard to those aggravated murder counts overall.

{¶ 83} And the jury finding that Webster himself acted purposely and with prior calculation and design in causing the deaths further distinguishes this case from *Langford v. Ross Corr. Inst.*, 665 Fed. Appx. 388, 389 (6th Cir.2016) ("uphold[ing the Sixth Circuit's earlier] decision granting Langford habeas relief" where "the trial judge failed to instruct the jury on the mens rea for complicity and the state court's decision to the contrary was unreasonable in light of the language of the jury instructions and the record as a whole"), *cert. den.* 2017 U.S. Lexis 3404 (May 30, 2017). As the Sixth Circuit's original (now vacated) *Langford* decision noted, the jury there had *acquitted* Langford of an aggravated murder count alleging that he had killed " 'purposely and with prior calculation and design[.]' " *Langford v. Warden, Ross Corr. Inst.*, 593 Fed.Appx. 422, 426 (6th Cir.2014) *vacated Hooks v. Lanford*, 576 U.S. 1049 (2015). We need not analyze here what our result would be had Webster, like Langford, been acquitted of aggravated murder but convicted on the murder counts: the jury convicted Webster on the counts across the board.

{¶ 84} Under these circumstances and on the facts of the case (with Webster not present at the shootings), it is my view that the jury verdict on the aggravated murders "effectively embrace[d]" the "purposely" mens rea of the other shooting offenses or would render alternative verdicts there "impossible" (and the murder counts, of course, were merged at sentencing into the aggravated murder counts that produced the life without parole sentences, *see* February 27, 2020 Judgment Entry). *Compare California v. Roy*, 519 U.S. 2, 7 (1996) (Scalia and Ginsburg, JJ., concurring: error in omitting mens rea from complicity instruction is "harmless only if the jury verdict on other points effectively embraces this one or if it is impossible, upon the evidence, to have found what the verdict *did* find without finding this point as well") (emphasis in original), *with*

*Neder v. United States*, 527 U.S. 1 (1999) (jury instruction that omits an element is harmless error when it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict; abjuring test of *Roy* concurrence); *compare also Middleton v. McNeil*, 541 U.S. 433, 437 (2004) (citations omitted) (on petition for habeas corpus: " ' "[A] single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge," ' " and "the question is whether there is a ' " 'reasonable likelihood that the jury has applied the challenged instruction' " ' " in such a way as to relieve the state of its burden of proof beyond a reasonable doubt).   In any event, there is no miscarriage of justice on this score here and the plain error standard that obtains absent objection at trial is not satisfied.

{¶ 85} Given the circumstances of this case, including the particular instructions provided and the particular jury verdicts reached, I join in the judgment overruling Webster's first assignment of error. I concur in overruling the other two assignments as well, and in affirming the judgment of the trial court.

_____