[Cite as *State v. Moore*, 2022-Ohio-1732.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | |
| | : | No. 20AP-209 |
| v. | : | (C.P.C. No. 18CR-6228) |
| Milton Moore, | : | (REGULAR CALENDAR) |
| Defendant-Appellant. | : | |

D E C I S I O N

Rendered on May 24, 2022

**On brief:** *G. Gary Tyack,* Prosecuting Attorney, and *Kimberly M. Bond*, for appellee. **Argued:** *Kimberly M. Bond*.

**On brief:** *Todd W. Barstow*, for appellant. **Argued:** *Todd W. Barstow*.

APPEAL from the Franklin County Court of Common Pleas

BEATTY BLUNT, J.

{¶ 1} Defendant-appellant, Milton Moore, appeals the judgment of the Franklin County Court of Common Pleas, following his conviction for two counts of aggravated murder, four counts of kidnapping, three counts of felonious assault, and one count of aggravated burglary (all with firearm specifications), as well as one count of having weapon under disability.

{¶ 2} The facts underlying Moore's convictions began with a drug theft, which led to the armed kidnapping and assault of four apparent drug thieves. The thieves were restrained, pistol-whipped, and held hostage by Moore and his codefendants for hours; ultimately two of them were shot and killed.

{¶ 3} According to Columbus Police Officer Nicholas Talone, he and Officer Derek Corbin were investigating an unrelated incident at the Wedgewood apartment complex on

the early morning of July 19, 2017, when they heard several gunshots and saw a person running toward one of the buildings. As they approached a group of men standing on a nearby porch, one of the group suddenly fled. They pursued but failed to catch him, and at the same time were flagged down by a man who said his daughter had been shot. Officer Talone followed the man to his basement apartment unit where he found a woman with a gunshot wound to her back, apparently having been shot through bullet holes Officer Talone identified in the apartment's ceiling. Another responding officer, Sergeant Ronnie Lucas, went into the upstairs apartment where he found four men, all naked, all covered in blood, all with duct tape on their necks and wrists. Two of the men—Mulhidin Haji a.k.a "Dope Boy" and Omar Omar a.k.a "Cribface"—were standing, one of whom was screaming and the other of whom was dazed and in shock. Two other men were on the floor—one of them, subsequently identified as Abdul Yussuf a.k.a "Shotta," was deceased; the other, subsequently identified as Mohamed Mohamed, died a short time later.

{¶ 4} After investigation, it emerged that the four men had been taken hostage, beaten, and shot by a group of men who were trying to obtain drugs that had been stolen from them. The victims were all present at the Wedgewood apartment unit of Mulhidin Haji on the afternoon of July 18, 2017, when two men—Aden Hassan a.k.a "A" and Julius Anderson a.k.a "Juice"—burst into the apartment and began threatening them about $15,000 worth of stolen heroin. It emerged that Hassan's two younger brothers had sold the heroin to Abdul Yussuf at a fraction of its value, but at the time all four of the victims professed ignorance as to the drugs. Apparently frustrated by the victims' stonewalling, Anderson made a phone call to his dealing partner, codefendant Desmond Webster a.k.a "Cutty," who arrived at the apartment shortly thereafter and began pistol-whipping the men, apparently in an attempt to discover the location of the drugs.

{¶ 5} While Anderson held the victims at gunpoint, Webster made a phone call to Joshua Radabaugh, and instructed him to come to the apartment with some duct tape. After Radabaugh arrived, the victims were bound with duct tape and beaten. Eventually, Yussuf admitted that he knew the location of the missing drugs, and he, Radabaugh, and Hassan left to retrieve them. Webster and Anderson stayed behind with the other three victims at gunpoint. After about 40 minutes, Radabaugh, Hassan, and Yussuf returned with the heroin and some marijuana.

{¶ 6} Notwithstanding the retrieval of the drugs, Webster determined that the four victims should be killed, and he apparently called the defendant, Milton Moore, a.k.a "Red," to handle the matter. When Moore arrived at the apartment Webster handed him a firearm, even though he was already armed, and instructed him to kill the victims. Webster also instructed Radabaugh to obtain a can of gasoline to burn down the building. Radabaugh left, obtained the gasoline, and returned to Haji's apartment. The victims were forced to strip naked and were again restrained with duct tape, and Moore allegedly hit one of the victims who had refused to strip down.

{¶ 7} At around this same time, an individual known only as "Dolla" or "Dodda" arrived at Haji's apartment, apparently sent to the apartment by Anderson's marijuana dealer. Anderson allowed Dodda into the apartment, but Moore became worried that he was now a witness to their crimes and made Dodda strip naked also. Moore apparently determined that Dodda would be forced to shoot one of the victims to implicate him in the crime and keep him from going to the police and told Dodda that the only way he would be permitted to leave is if he shot one of the four men. Dodda agreed and was permitted to put his clothes back on.

{¶ 8} At this point, Anderson, Radabaugh, Hassan, and Webster went outside, leaving Moore and Dodda inside with the four victims. Radabaugh left the apartment complex to move his sister's car, and shortly thereafter, shots were heard from inside the apartment. When he saw police running toward the apartment building, Anderson fled the scene, as apparently did Moore, Dodda, Webster, and Hassan. Radabaugh returned shortly thereafter to "clean up" but when he saw that the police had already arrived, he left the scene in a nearby car to which Webster had previously given him keys. He drove into a parking lot close by, where he ingested heroin, but when he saw a police officer approaching his car he drove off, and set fire to the car in an alley.

{¶ 9} After the shooting stopped and Moore and Dodda left the apartment, Omar and Haji were able to loosen the duct tape with which they had been bound enough so that Omar could jump through a window to the ground below. After looking for someone to call an ambulance, Omar returned to the apartment, and the four victims were discovered by Officer Lucas shortly thereafter.

{¶ 10} Radabaugh, Webster, and Webster's girlfriend left Ohio, and were subsequently apprehended after a traffic stop in Oklahoma—Webster was discovered in the trunk of the vehicle. Once Moore was identified as a suspect in the incident and a warrant for his arrest was issued, he turned himself in to the authorities with the help of his church in Cleveland, Ohio.

{¶ 11} Ultimately, the state indicted Webster, Anderson, Radabaugh, Hassan, and Moore in connection with the crimes. Hassan, Radabaugh, and Anderson pleaded guilty to amended charges. Webster and Moore were tried together, and both Radabaugh and Anderson testified against them; Omar testified against them as well. Ultimately, both Webster and Moore were found guilty—Moore was convicted of four counts of kidnapping, three counts of felonious assault, one count of aggravated burglary, one count of having weapon under disability, and two counts of aggravated murder.[1] He was sentenced to a term of life in prison without possibility of parole, and has filed this timely appeal. He asserts three assignments of error with the trial court's judgment:

> I. The trial court erred and deprived appellant of due process of law as guaranteed by the Fourteenth Amendment to the United States Constitution and Article One Section Ten of the Ohio Constitution by finding him guilty of Aggravated Murder; Murder; Attempted Murder; Aggravated Burglary; Aggravated Robbery; Kidnapping; and Felonious Assault, as those verdicts were not supported by sufficient evidence and were also against the manifest weight of the evidence.
>
> II. Appellant's trial counsel was ineffective, thereby denying him his right to effective assistance of counsel as guaranteed by the United States and Ohio Constitutions.
>
> III. The trial court erred to the prejudice of appellant by permitting the state to improperly impeach its own witness, thereby depriving appellant of a fair trial.

{¶ 12} In his first assignment of error, Moore argues that his convictions were not supported by sufficient evidence and were against the manifest weight of the evidence. "The legal concepts of sufficiency of the evidence and weight of the evidence are both quantitatively and qualitatively different." *State v. Thompkins*, 78 Ohio St.3d 380, 386

---

[1] Webster also appealed, and this court affirmed his conviction on September 26, 2021. *See State v. Webster*, 10th Dist. No. 20AP-171, 2021-Ohio-3218.

(1997), *superseded by constitutional amendment on other grounds.* " '[S]ufficiency' is a term of art meaning that legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law.' " *Id.*, quoting *Black's Law Dictionary* 1433 (6th Ed.1990). "[S]ufficiency is a test of adequacy. Whether the evidence is legally sufficient to sustain a verdict is a question of law." *Id.*, quoting *State v. Robinson*, 162 Ohio St. 486 (1955). "[A] court shall not order an entry of judgment of acquittal if the evidence is such that reasonable minds can reach different conclusions as to whether each material element of a crime has been proved beyond a reasonable doubt." *State v. Bridgeman*, 55 Ohio St.2d 261, (1978) syllabus. *Compare State v. Jenks*, 61 Ohio St.3d 259, (1991) paragraph two of the syllabus. "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id.*, following *Jackson v. Virginia*, 443 U.S. 307, (1979).

{¶ 13} By contrast, whether a finding of guilt is supported by the "manifest weight" of the evidence requires evaluation of the credibility and weight of the testimony, which are questions primarily for the trier of fact. *State v. DeHass*, 10 Ohio St.2d 230 (1967), paragraph one of the syllabus. The jury, or the court in a bench trial, may take note of inconsistencies at trial and resolve them accordingly, "believ[ing] all, part, or none of a witness's testimony." *State v. Raver*, 10th Dist. No. 02AP-604, 2003-Ohio-958, ¶ 21, citing *State v. Antill*, 176 Ohio St. 61, 67 (1964). Therefore, "[w]hen a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a 'thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony." *Thompkins* at 387, quoting *Tibbs v. Florida*, 457 U.S. 31, 42 (1982). An appellate court considering a manifest weight challenge "may not merely substitute its view for that of the trier of fact, but must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Harris*, 10th Dist. No. 13AP-770, 2014-Ohio-2501, ¶ 22, citing *Thompkins* at 387. Appellate courts should reverse a conviction as being against the manifest weight of the evidence only in the most " 'exceptional case in which the evidence

weighs heavily against the conviction.' " *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983).

{¶ 14} Despite his reference to sufficiency, Moore's brief mainly argues that his convictions were against the manifest weight of the evidence. And that is sensible—the testimony of Radabaugh, Anderson, and Omar regarding Moore's actions and involvement in the crimes satisfy the *Jenks* standard, in that through that testimony the state was easily able to present evidence as to every element of each offense. Therefore, Moore primarily argues that the testimony of all three witnesses was unreliable—his brief argues that the only evidence of conviction in his case "was brought by the testimony of witnesses, all of whom lied significantly." (Appellant's Brief at 2.) But the credibility of those witnesses is a jury question regarding weight of evidence, not a question of sufficiency.

{¶ 15} Omar was the only eyewitness who was directly able to tie Moore to the actual shootings, and his testimony regarding Moore's identity was fairly weak. He lied to the police at the time of the offense, gave an in-court description of the shooter that did not match Moore, and was never directly asked to identify Moore in court. But when Omar's testimony is taken together with the testimony of Radabaugh and Anderson, it supports the state's theory that Moore was at least complicit in all of the crimes and was the shooter in the aggravated murder of Mohamed Mohamed.

{¶ 16} Moore himself has recognized the limitations of his credibility arguments when he summarizes his position as stating that the "trial jury was hoodwinked by self-proclaimed hustlers." *Id.* at 3. While Moore is certainly free to argue that Anderson, Radabaugh, and Omar all lied to implicate him, on a full review of the record we cannot say that the jury clearly lost its way or created a manifest injustice by choosing to believe their testimony. Accordingly, Moore's conviction was supported by sufficient evidence and was not against the manifest weight of the evidence presented, and his first assignment of error is overruled.

{¶ 17} In his second assignment of error, Moore argues that his trial counsel was ineffective. In order to obtain a reversal on appeal for ineffective assistance of counsel, a defendant must demonstrate both that defense counsel's performance was deficient, and that counsel's deficient performance prejudiced the defense. *See generally Strickland v. Washington*, 466 U.S. 668, 686 (1984). In assessing claims of counsel's deficiency, "a court

must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' " *Id.* at 689, quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955). And in evaluating whether the challenged action caused prejudice, the court must find that counsel's error was so serious that there is a reasonable probability it affected the outcome of the trial. *See, e.g., State v. Bradley*, 42 Ohio St.3d 136 (1989).

{¶ 18} Moore asserts two specific errors with trial counsel's performance. First, he argues that counsel failed to object to the improper statements in the prosecutor's opening that the crimes in this case created a "ripple effect" and "our community as a whole" was affected by "actions like this." (Appellant's Brief at 5.) Second, he argues that trial counsel was ineffective by failing to remain present for the presentation and resolution of a jury question and by instead sending another attorney to cover that portion of the case.

{¶ 19} As to the first issue, we do not believe that the prosecutor presented a "community problem" argument that would have been forbidden by the rule of *State v. Draughn*, 76 Ohio App.3d 664, 671 (5th Dist.1992). *See also United States v. Solivan*, 937 F.2d 1146 (6th Cir.1991). In *Draughn*, the state's rebuttal argument, over objection and instruction, repeatedly pressed the jury "to convict appellant to aid their local police in taking back their neighborhoods from drug dealers." *Draughn*, at 674. The appellate court held that based on "the improper tenor of the entire rebuttal argument, and the prosecutor's persistence in making such argument after the court repeatedly sustained appellant's objections, the court abused its discretion in overruling [defendant's] motion for mistrial." *Id.* Similarly, in the drug trafficking case *Solivan*, the U.S. Attorney argued in closing that he was "asking you to tell her and all of the other drug dealers like her - - that we don't want that stuff in Northern Kentucky and [] anybody who brings that stuff in Northern Kentucky * * *." *Solivan*, at 1148. The appellate court held that although the U.S. Attorney's remarks "were isolated to * * * closing argument * * * this fact does not ameliorate their prejudicial impact; the remarks were misleading, inflammatory and prejudiced defendant's right to a fair trial." *Id.* at 1155.

{¶ 20} This case is quite different. Here, the prosecutor made a single stray remark, in opening statement, that crimes as serious as the ones for which Moore was on trial

created a "ripple effect" and that the "community as a whole [is] affected when actions like this take place." (Tr. Vol. 2 at 263.) These statements seem unremarkable—the prosecutor did not attempt to shift blame for some broader community issue onto Moore and did not actually make a "protect the community" or "send a message" argument. Instead, the prosecutor simply observed that serious conduct has serious effects, some of which go beyond the incident itself. For that reason, no *Draughn* error occurred—there is a substantial difference between repeatedly encouraging the jury to convict a defendant to aid police and retake neighborhoods from drug dealers and the state's vague comment regarding the broad "ripple effect" of these crimes.

{¶ 21} Moreover, because this claim arises in the context of counsel's failure to object to the statement, in addition to showing that the statements were so egregious that no curative instruction would set the case aright, Moore must also demonstrate that counsel's failure to object was prejudicial to him within the context of the entire trial. *See, e.g., State v. Keenan*, 66 Ohio St.3d 402, 410 (1993). This he cannot do—even if we were to conclude that the state's single sentence in opening statement violates the rule of *Draughn*, the trial court's instruction that opening statements "are not evidence" was sufficient to cure any alleged prejudice caused by it. In short, because the prosecutor's single sentence in opening statement did not seek to incite the passions of the jury and did not ask the jury to disregard its duty, Moore has failed to show that the lack of objection constituted deficient performance. And because the trial court gave an instruction limiting the use of that statement, Moore could not have been prejudiced by it.

{¶ 22} Moore also argues that trial counsel prejudiced him by failing to remain present for the presentation and resolution of a jury question and instead sending another attorney to cover that portion of the case. But the state correctly observes that the record is insufficient to establish that Moore was not informed of this decision. (*See* Tr. Vol. 8 at 1265-72.) It is just as likely that Moore knew of and approved of counsel's decision as it is that he did not, and we cannot presume error in the absence of evidence.

{¶ 23} Surely, it would have been better for the trial court to have specifically obtained Moore's waiver of trial counsel's presence on the record at the time the issue arose. But this court cannot presume deficient performance from a silent record. *Compare State v. Thompson*, 141 Ohio St.3d 254, 2014-Ohio-4751, ¶ 247 (ineffective assistance based on

failure to investigate cannot be inferred with from silent record). Moore therefore fails to show that his counsel performed deficiently, as is required under *Strickland*. And for all these reasons, Moore's second assignment of error has no merit and is overruled.

{¶ 24} In his third assignment of error, Moore argues that the trial court improperly and over objection permitted to impeach its own witness, Omar Omar. Although the state listed Omar as a witness for the prosecution, it was unable to locate him when the case ultimately went to trial. Omar was located mid-trial in the custody of Immigration and Customs Enforcement, and his testimony was heard late in the trial. *See, e.g., State v. Webster*, 10th Dist. No. 20AP-171, 2021-Ohio-3218. Moore challenges Omar's testimony, arguing that the state was permitted to "impeach" his testimony describing the "dude with the dreads" who shot Mohamed (alleged to be Moore) with his prior statement to the police. When asked to describe the man who shot Mohamed, Omar initially testified as follows:

> Q: Describe the dude with the dreads.
>
> A: He was just an old dude with dreadlocks. That was it.
>
> Q: Was he a skinny guy like me or what?
>
> A: Yeah, he was a skinny guy.
>
> Q: Oh, he was skinnier?
>
> A: He was skinny. He was skinny.

(Tr. Vol. 5 at 994.)

{¶ 25} Shortly thereafter, and once Omar had finished his recitation of the facts of the incident, the prosecutor proceeded to ask him: "If you heard just a tiny part of a previous interview you gave, would it possibly refresh your memory and help you remember better about the description you gave and the size of the guy with the dreads? Would that be helpful?" *Id*. at 1007. Defense counsel objected, arguing that the request was improper. The court required the state to lay a proper foundation for the question, which the state then proceeded to do by eliciting testimony that the incident was over two years earlier and that Omar didn't "really remember a lot." *Id*. at 1009. Omar's previous interview with the police describing "the dude with the dreads" was then played for him outside the presence of the jury. *Id*. at 1009-10.

Q: Mr. Omar, does reviewing that, what you just - - that interview that you just heard, does that refresh your memory as to the approximate height and weight of the man with the dreads?

A: Yeah.

Q: Does that refresh your memory?

A: Yeah.

*Id.* at 1011. Under further questioning in the presence of the jury, Omar then proceeded to testify that he didn't know "the dude with the dreads," hadn't ever seen him before the incident, and that "the dude" was over 6 feet tall and weighed approximately 250 pounds. *Id.* at 1012-13.

{¶ 26} Aside from Moore's original objections that the state lacked a foundation to refresh Moore's recollection and that the question had already been answered, none of this testimony was objected to by the defense. And on cross-examination, Moore's attorney did not attempt to clarify any of this testimony; instead, both Webster's attorney and Moore's attorney established that Omar was unable to identify Moore in a photo array he had been shown at the same time he gave the interview. *Id.* at 1015-16 and 1032-34.

{¶ 27} Moore now argues that this procedure does not comply with Evid.R. 607, which provides in relevant part that the "credibility of a witness may be attacked by any party except that the credibility of a witness may be attacked by the party calling the witness by means of a prior inconsistent statement only upon a showing of surprise and affirmative damage." Moore contends that because he had not testified that he had a problem remembering or that he was struggling with his memory about his description of "the dude with the dreads," that rather than refreshing Moore's recollection the state was impeaching Moore's credibility with a prior inconsistent statement. Moore relies on *State v. Pace*, 10th Dist. No. 97APA10-1425, 1998 Ohio App. Lexis 3613, (Aug. 6, 1998), in which the state was permitted by the trial court to impeach its own witness with a statement he had previously given to the police:

> [A]ppellant contends that the trial court erred when it allowed the prosecutor to testify to facts by way of impeaching his own witness, thereby denying appellant his right to a fair trial. The prosecution's first witness was Anthony Jones. Jones testified that he had known appellant for approximately five years. The

prosecutor asked Jones whether he had accompanied appellant to a gun store and Jones responded that he could not remember. The prosecutor then asked if Jones had talked to him on the telephone a few days earlier and Jones stated that he had, but Jones could not remember telling the prosecutor that appellant had purchased some ammunition. Jones also did not remember being videotaped during his statement to the police, although he did remember talking to them and stated that he was very drunk at the time.

The prosecutor then gave Jones a summary of his interview with the police. Appellant's counsel objected but Jones was permitted to read the statement to himself to refresh his recollection. The prosecutor then asked Jones about a paragraph in the statement in which he stated that appellant had an assault-style weapon and Jones responded that he did not recall making the statement. The prosecutor then questioned Jones about another part of the statement in which it stated that Jones recalled appellant buying 9-millimeter bullets and AK-47 style bullets to use in robberies. Appellant's counsel again objected. Although Jones did not deny making the statement, he testified that he did not know the difference between an SKS bullet or an AK-47 bullet. The prosecutor then asked Jones whether he recalled accompanying appellant to a gun store in Obetz where appellant purchased some ammunition, and Jones responded that he remembered accompanying appellant to the store but he did not know what appellant purchased.

*Pace* at *5-6. On appeal, this court held that under Evid.R. 607, "the trial court could only permit the prosecutor to impeach Jones by means of the prior statement if the prosecutor was surprised as to the content of the testimony and the prosecutor's case was affirmatively damaged by the testimony," *id.* at *8, and also that "[t]he questioning resembled an attempt to circumvent Evid.R. 607 and impeach the witness * * * since the evidence should not have been used to impeach the witness, it should also not have been read aloud to refresh his recollection." *Id.* at *13-14.

{¶ 28} In response to Moore's argument, the state contends that this case is very different from *Pace*. First and most notably, once the defense's initial objection was sustained, the state laid a proper foundation to refresh Omar's recollection, something that did not happen in *Pace*. Second, in this case the prior statement was not improperly read into the record by the state in the form of questions. Finally, even disregarding Omar's

testimony about the height and weight of "the dude with the dreads," Radabaugh and Anderson specifically identified Moore as one of the two men left with the victims, and Omar clearly testified that each of those men shot one of the two victims. (*See* Appellee Brief at 26-28.)

{¶ 29} We agree with the state. Here, the state was not impeaching Omar, it was properly refreshing his recollection. It is worth noting that Omar was never asked to and never attempted to identify Moore in court. But more important, Omar clearly stated on the record, without any prompting, that he didn't "really remember a lot":

> Q: Mr. Omar, when you spoke to the police first and gave descriptions of all the men who did this, was that over two years ago?
>
> A: Yeah.
>
> Q: Okay. And so over two, two and a half years has gone by?
>
> A: I don't really remember a lot.
>
> Q: A lot of time, right?
>
> A: Right. I don't really remember a lot.
>
> Q: Would it help you refresh your memory as to the things you said if you were able to—help you remember if you were able to listen to just a tiny spot, tiny piece of the interview you had back in 2017? Would it help your memory to remember what you said, to listen to a small part of it?
>
> A: Yeah.
>
> ***
>
> Q: Mr. Omar, does reviewing that, what you just—that interview that you just heard, does that refresh your memory as to the approximate height and weight of the man with dreads?
>
> A: Yeah.
>
> Q: Does that refresh your memory?
>
> A: Yeah.

Q: All right. Is that an accurate description?

A: Yeah.

(Tr. Vol. 5 at 1009, 1011.) This is exactly the procedure commonly used for properly refreshing a witness's recall. *Compare* Thomas A. Mauet, *Trial Techniques*, Section 4.6 *Refreshing a witness's recollection* (4th Ed.1996). It is certainly distinguishable from the procedure this Court rejected in *Pace*—reading hostile leading questions from a witness's prior statement over a series of flat denials and professed complete lack of recall from the witness. Accordingly, Moore has not established that the trial court erred by allowing the state to refresh Omar's recollection. And because Moore did not object to this testimony, he is required to establish not only error, but plain error. *See, e.g., State v Payne*, 114 Ohio St.3d 502, 2007-Ohio-4642, ¶ 16-17, citing *State v. Barnes*, 94 Ohio St.3d 21, 27 (2002) (holding that to establish plain error, the appellant must show a deviation from the legal rule that is both an obvious and affected the trial's outcome). The record clearly fails to demonstrate plain error, and in fact shows no error at all. Moore's third assignment of error is overruled.

{¶ 30} For the foregoing reasons, appellant's three assignments of error are overruled and the judgment of the Franklin County Court of Common Pleas is affirmed.

*Judgment affirmed.*

SADLER and JAMISON, JJ., concur.

———————————————